**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **JOUETT INVESTMENTS INC., and** | § | |
| **JOUETT RT ASSOCIATES, INC.,** | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 3:14-CV-1803-L** |
| | § | |
| **INTUIT INC.,** | § | |
| **Defendant.** | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION**

Pursuant to the order of reference dated September 3, 2014 (doc. 12), before the Court is *Intuit's Motion to Dismiss for Lack of Subject Matter Jurisdiction and Failure to State a Claim for Which Relief Can be Granted, Or in the Alternative, Motion to Transfer Venue*, filed September 2, 2014 (doc. 9). Based on the relevant filings and applicable law, the motion to dismiss for lack of subject-matter jurisdiction should be **GRANTED**, and the remaining motions should be **DENIED as moot**.

**I. BACKGROUND**

Jouett RT Associates, Inc. (JRT), is a successor entity to Jouett Investments, Inc. (JII) (collectively, Plaintiffs), both small businesses. (doc. 1 at 1.)[1] They sue Intuit Inc. (Defendant), a computer software company that develops financial and tax preparation software and related services for individuals, accountants, and small businesses, for damages resulting from erroneous tax filings made to the Internal Revenue Service (IRS). (doc. 1 at 2; doc. 10 at 7.)

**A. Factual Summary**

In September of 2002, JII began using the desktop version of Defendant's Quickbooks

---

[1]Citations to the record refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

software, which included a function for generating payroll checks and filing federal and state tax documents.  (doc. 14-1 at 1.)  It subsequently began using Quickbooks Assisted Payroll.  (*Id*.)

On October 1, 2010, JII's payroll functions and liabilities were transferred from JII to JRT following "extensive preparations in coordination with Intuit Quickbooks [Assisted] Payroll."  (doc. 1 at 2; *see* doc. 14-1 at 1.)  Plaintiffs allege that unknown to them at the time, Defendant had mishandled their tax filings with the IRS, which caused tax levies to be assessed against both entities beginning in February of 2012.  (*Id*. at 2.)  They contend that between February and November of 2012, they asked Defendant to correct the erroneous IRS filings and postings.  (*Id*.)  However, they asserted that Defendant failed to respond to them as of November of 2012.  (*Id*.)

Plaintiffs allege that in order to protect their interests and assets, they asked their Certified Public Accountant (CPA) to conduct an analysis of "available documentation, including corporate tax returns, copies of W-2s and 941s and IRS transcripts for both entities."  (*Id.* at 3.)  In March or April of 2013, the CPA discovered errors made by Defendant, and because Defendant had done nothing to correct its erroneous filings with the IRS, he communicated his findings to the IRS.  (*Id.*)  According to Plaintiffs, the CPA learned that the IRS "supposedly" reversed the erroneous levies, penalties and interest, which brought the balance owed in the tax transcripts to zero.  (*Id.*)

However, in November of 2013, JRT received an "IRS notice of intent to seize of $6,449.37," and JII received an "IRS notice of federal tax lien of $119,379.32," both of which Plaintiffs contend stemmed from Defendant's erroneous tax filings on their behalf.  (*Id.*)  Plaintiffs claim that they immediately sent the notice to Defendant, and the CPA contacted the IRS, who placed the Plaintiffs' liens and levies on hold until corrected filings could be made.  (*Id.*)  They assert that the CPA and the IRS conducted a new analysis and confirmed the erroneous filings.  (*Id.*)

2

Plaintiffs allege that they then contacted Defendant's Notice Resolution Unit and asked them to submit the required corrected filings to resolve the outstanding levies and liens, but Defendant refused to do so.  (*Id*.)  On February 27, 2014, Michael Jouett, President of JII and JRT, called the Notice of Resolution Unit regarding the erroneous filings and spoke with Cynthia Harris.  (*Id.*)  Ms. Harris told Mr. Jouett to email her the pertinent documentation, which he did.  (*Id*.)  Ms. Harris acknowledged receipt of the documents and told Mr. Jouett that she had forwarded the information to Defendant's Tax Amendment Department.  (*Id*.)  Plaintiffs contend that despite follow-up emails to Ms. Harris, Mr. Jouett did not hear anything from the Tax Amendment Department.  (*Id*.)

On March 14, 2014, Mr. Jouett receive a phone call from Michelle Lewis, Defendant's Notice Resolution Team Manager, who apologized for not contacting Plaintiffs sooner and said she confirmed with the IRS that they received corrected filings made by the CPA.  (*Id.*)  She said her team would follow up and make sure all issues related to the erroneous tax filings were completely resolved.  (*Id*.)  Mr. Jouett informed Ms. Lewis that Plaintiffs would be seeking reimbursement for their "direct expenses to-date" in the amount of $24,873.75, and Ms. Lewis said she would see what she could do.  (*Id.*)

Plaintiffs contend that on that same day, Ms. Lewis left Mr. Jouett a voice mail message indicating that one of her team members had been in touch with the IRS to inform it that she would be sending a revised Schedule D to ensure that all tax payments postings were correct.  (*Id*. at 5.)  Plaintiffs claim that when Mr. Jouett heard nothing further by March 20, 2014, they were forced to retain counsel to pursue legal remedies against Defendant.  (*Id*.)

On April 4, 2014, Plaintiffs' counsel sent a written demand to Ms. Lewis that Defendant take all necessary steps to resolve the Plaintiffs' tax issues and reimburse them for their "accounting

3

expenses, executive time spent in dealing with the tax issues, and attorneys' fees to date." (*Id.*) Plaintiffs contend that Ms. Lewis represented via email that corrective action was being taken with the IRS. They contend that as of the date they filed the complaint, they had not received written confirmation that their tax liabilities had been set aside, and Defendant had not made any proposal to reimburse their requested expenses. (*Id.*)

Mr. Jouett submitted an affidavit stating that it was only after his counsel filed this lawsuit against Defendant that Plaintiffs received notification from the IRS that the assessed payroll taxes, interest, and penalties, which initially exceeded $100,000 had been removed from their accounts. (doc. 14-1 at 3.) Mr. Jouett avers that at that point in time, Plaintiffs had incurred nearly $25,000 in CPA fees, $5,000 in attorneys' fees, and $16,000 in executive management time in dealing with the erroneous tax filings. (*Id.*)

B.     **Quickbooks Payroll and Tax Filings**

The affidavit of Jason Shipp, a service and support manager in the Defendant's payroll division, states that JRT ran the Enhanced version of Quickbooks Payroll in 2010. (doc. 10-1 at 25.) On November 5, 2010, "Jouett" ungraded from the Enhanced version to the Assisted version, which permitted Defendant to file payroll taxes and filings on its behalf. (*Id.* at 26.) According to Shipp, in order to use any Intuit product, including Quickbooks Assisted Payroll, Defendant's customers are required to "agree" to the Quickbooks End User License Agreement (the EULA) at either the initial set-up of the software or when they upgraded their software. (*Id.* at 25.) Customers cannot complete the software installation or upgrade processes without agreeing to the EULA. (*Id.*)

Mr. Shipp testified that as part of the upgrade process, "Jouett" submitted a "balance file." (*Id.* at 26.) A customer who upgraded from the 2010 Quickbooks Enhanced Payroll software to the

Assisted version of the software on October 5, 2010, would have agreed to the 2010 Software License Agreement for Quickbooks Software and Intuit Payroll Services (the License Agreement). (*Id*.) He contends that by "generating a PIN, transmitting a balance file, and upgrading its services," "Jouett" would have necessarily "clicked that it agreed to the License Agreement." (*Id*.)

Ms. Lewis's affidavit states that the filings that Plaintiffs complain of in their complaint were made in "January and February 2011, for the 4th quarter and year-end of 2010, respectively." (doc. 10-1 at 27.) Plaintiffs paid $1,740.30 in fees to Defendant in the twelve months prior to February 2011, which was February 2010 through January 2011. (*Id*.)

On June 3, 2014, the IRS issued an account transcript for JII for the tax period of December 31, 2010. (doc. 10-1 at 34.) According to the transcript, on May 12, 2014, $100,383.29 in prior taxes were abated, and $13,837.75 in penalties and interest were removed from JII's account. (*Id*. at 35-36.) At the time, all of the taxes, interest, and fees were abated and removed from JII's account except for $1.91, which was removed on May 26, 2014. (*Id*. at 26.) Also on May 12, 2014, a payment of $145.91 was made to the account, but the payment, along with the addition of $.10 in interest, was refunded on June 2, 2014. (*Id*.) The transcript showed an account balance of $0.00. (*Id*. at 34.) On August 20, 2014, the IRS issued an account transcript for JRT for the tax period of December 31, 2010, which showed an account balance of $0.00. (*Id*. at 38.)

Mr. Jouett avers that in June of 2014, Plaintiffs received notification from the Social Security Administration (SSA) that they had reported more wages to the IRS than what was reported to the SSA, which created a potential underpayment of SSA taxes. (doc. 14-1 at 3; doc. 14-2 at 1.) He contends that Defendant was notified of the SSA wage issue by Mr. Baines on July 21, 2014. (doc. 14-1 at 3.) As of the date Plaintiffs' response was filed, the SSA issue remained open. (*Id*.)

5

C.      **The License Agreement**[2]

The introductory paragraph of Part A states, in part:

By clicking I AGREE, and/or accessing or using the Software, you indicate that you have read and understood and agree to be bound by the terms of this Agreement.  If you do not agree to the terms of this Agreement, you are not granted any rights whatsoever in the Software, and you will not be able to access or use the Software.

(doc. 10-1 at 3.)

Part A of the License Agreement includes a choice of law clause which states that it "will be governed by California law, without regard to its conflicts of law principles, and applicable federal law." (*Id*. at 9.)  It also contains a forum-selection clause which states that the parties "hereby consent to the exclusive jurisdiction and venue in the state courts in Santa Clara County, California or federal court for the Northern District of California." (*Id*.)

Additionally, Part A of the License Agreement contains a Limitation of Liability and Damages clause which provides, in part, as follows:

10.      **LIMITATION OF LIABILITY AND DAMAGES**. IN NO EVENT WILL INTUIT BE LIABLE FOR ANY LOSS, COST, LIABILITY OR DAMAGE INCURRED AS A RESULT OF YOUR RECEIPT OF OR PARTICIPATION IN THIRD PARTY SERVICES.   THE ENTIRE CUMULATIVE LIABILITY OF INTUIT [AND] ITS AFFILIATES AND ITS SUPPLIERS FOR ANY REASON ARISING FROM OR RELATING TO THIS AGREEMENT SHALL BE LIMITED TO THE AMOUNT PAID BY INTUIT FOR THE SOFTWARE IN THE 12 MONTH PERIOD IMMEDIATELY PRECEDING THE EVENT GIVING RISE TO SUCH CLAIM, UNLESS OTHERWISE SEPARATELY AGREED BY INTUIT IN WRITING.

The introductory paragraph of Part B provides:

Your use of the Software, Add-on Products, and related Services provided by Intuit

---

[2]Although the first part of the License Agreement is not labeled "Part A," the second part of the License Agreement is labeled "Part B." (*See* doc. 10 -1 at 3, 9.)  For ease of reference, the first part of the License Agreement is referred to as "Part A".

are subject to the General Terms of Service above including these Additional Terms and Conditions which govern your use of the Software, Add-on Products and related Services indicated below. These Additional Terms and Conditions shall prevail over any conflict or inconsistency with the General Terms of Service above.

(*Id*. at 9.)

Section B.7. of the Agreement is entitled, "Terms for Payroll Products and Services." (*Id*. at 14.) Subsection B.7.(2). is entitled, "Quickbooks Assisted Payroll and Assisted Advantage Payroll Service ("Assisted Payroll")." (*Id*.) It provides, in part, that "[s]ervice availability and additional terms and conditions of Assisted Payroll are provided within the Quickbooks Assisted Payroll Services Agreement." (*Id*.) Subsection B.7.(2) covers payroll taxes. (*See id*.)

## D.    **The Lawsuit**

On May 16, 2014, Plaintiffs filed this lawsuit against Defendant. (doc. 1.) Their complaint asserts claims for breach of contract and breach of express and implied warranties, for which they seek damages. (doc. 1 at 5-7.)

On September 2, 2014, Defendant filed a 12(b)(1) motion to dismiss for lack of subject matter jurisdiction and a 12(b)(6) motion for failure to state a claim, or in the alternative, a motion to transfer venue. (doc. 9.) With a timely-filed response[3] (doc. 14), and a timely-filed reply (doc. 15), the motions are now ripe for recommendation.

## II.  RULE 12(b)(1) MOTION TO DISMISS

Defendant moves to dismiss the complaint under Rule 12(b)(1) for lack of subject-matter

---

[3]On October 27, 2014, as a supplement to their response to Defendant's motion to dismiss, Plaintiffs filed an October 23, 2014 notice of intent to levy regarding $6,669.85 in overdue taxes and accrued interest, which was sent to JRT by the IRS. (docs. 16; 16-1.) Plaintiffs failed to file leave to supplement their response brief or evidence in accordance with Northern District of Texas Local Rule 56.7. The notice of intent to levy is therefore not considered. As discussed below, however, consideration of the notice would not change the recommended disposition of the motion to dismiss.

jurisdiction. (doc. 9.)[4]

A motion to dismiss under Rule 12(b)(1) challenges a court's subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1). Such a motion "may be raised by a party, or by a court on its own initiative at any stage in the litigation, even after trial and the entry of judgment." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506–07 (2006). The Court must dismiss the action if it determines that it lacks jurisdiction over the subject matter. Fed. R. Civ. P. 12(h)(3); *Stockman v. Fed. Election Comm'n*, 138 F.3d 144, 151 (5th Cir. 1998). The dismissal "is not a determination of the merits," however, and "it does not prevent the plaintiff from pursuing a claim in a court that does have proper jurisdiction." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).

## A. <u>Legal Standard</u>

"Federal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (citations omitted). They "must presume that a suit lies outside this limited jurisdiction, and the burden of establishing federal jurisdiction rests on the party seeking the federal forum." *Howery v. Allstate Ins. Co.*, 243 F.3d 912, 916 (5th Cir. 2001).

The district court may dismiss for lack of subject-matter jurisdiction based on (1) the complaint alone; (2) the complaint supplemented by undisputed facts in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts. *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981) (en banc). A motion to dismiss based on the complaint alone presents a "facial attack" that requires the court to merely decide whether the

---

[4] When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir.2001) (citing *Hitt v. City of Pasadena*, 561 F.2d 606, 608 (5th Cir.1977)). This "prevents a court without jurisdiction from prematurely dismissing a case with prejudice." *Id.*

allegations in the complaint, which are presumed to be true, sufficiently state a basis for subject matter jurisdiction. *See Paterson v. Weinberger*, 644 F. 2d 521, 523 (5th Cir. 1998). "If sufficient, those allegations alone provide jurisdiction." *Id*. Facial attacks are usually made early in the proceedings. *Id*. When evidence is presented with the motion to dismiss, the attack is "factual." *Williamson*, 645 F.2d at 413. In that case, "no presumptive truthfulness attaches to [the] plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Id.* A factual attack may occur at any stage of the proceedings. *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980). "To defeat a factual attack, a plaintiff 'must prove the existence of subject-matter jurisdiction by a preponderance fo the evidence' and is 'obliged to submit facts through some evidentiary method to sustain his burden of proof.'" *Superior MRI Services, Inc. v. Alliance Healthcare Services, Inc*., 778 F.3d 502, 504 (5th Cir. 2015)(quoting *Irwin v. Veterans Admin*., 874 F.2d 1092, 1096 (5th Cir. 1989)); *see also Paterson*, 644 F. 2d at 523.

Here, Defendant relies on evidence outside of the record in support of its 12(b)(1) motion, therefore, the motion presents a factual attack. Accordingly, to maintain jurisdiction, Plaintiffs must prove the existence of subject-matter jurisdiction by a preponderance of the evidence. *See Superior MRI Services, Inc.*, 778 F.3d at 504.

## B.     Applicability of the License Agreement to Plaintiff's Claims

Defendant contends that the Plaintiffs' breach of contract and breach of warranties claims are covered by the License Agreement. (doc. 10 at 6.) It argues that due to the limitation of liability clause in the License Agreement, Plaintiffs' recoverable damages are limited to less than $2,000. (*Id*. at 11.)

9

Plaintiffs respond that their causes of action are not based on their use of the Quickbooks software, but rather upon the additional payroll services performed by Defendant. (doc. 14 at 5.) They argue that these services are not expressly included within the limitation of liability clause in the License Agreement, which applies to Defendant's software and third party services not performed by Defendant. (*Id.*) They highlight the phrases in Paragraph 10 of Part A that say that Defendant will not be liable for loss "incurred as a result or receipt of or participation in third party services", and that Defendant's cumulative liability for any reason arising out of the License Agreement is limited to the amount paid to Defendant for the "Software" in the 12 months preceding the event giving rise to the claim. (*Id.* at 11.)

Based on the name alone, the License Agreement purports to cover both Quickbooks software and payroll services. (*See* doc. 10-1 at 3.) In fact, Part B covers terms and conditions for software, add-on-products, *and* related services provided by Defendant, and Section B.7 of the License Agreement covers payroll products and services. (*Id.* at 9, 14.) Subsection 7(2) specifically covers Quickbooks Assisted Payroll Services, which Mr. Jouett admits Plaintiffs used during the time of the alleged misfilings, and pursuant to which Defendant made the alleged misfilings. (doc. 14-1 at 1.) Part B provides that the customer's use of the software, add-on products, and related services are subject to the general terms of service outlined in the first part of the License Agreement as well as the additional terms and conditions provided in Part B. (*Id.* at 9.)

Plaintiffs allege in their complaint that Defendant mishandled their filings with the IRS, and as a result, they bring claims for breach of contract and breach of express and implied warranties. (doc. 1 at 2, 5-7.) They contend in support of their breach of contract claim that Defendant breached its agreement to provide proper payroll and tax filing services. (*Id.* at 6.) In support of their breach

of warranties claim they contend that Defendant breached express, or alternatively, implied warranties that its payroll and tax services would be performed diligently and correctly.  (*Id.*) Plaintiffs' breach of contract and breach of warranties claims are based on Defendant's payroll services, which include tax filing services.  Accordingly, the License Agreement is applicable to, and covers, Plaintiff's breach of contract and breach of warranties claims.

## C.    Amount in Controversy

Defendant argues that Plaintiffs do not have subject-matter jurisdiction over Plaintiffs' claims because the amount in controversy does not exceed $75,000.  (doc. 10 at 11.)

Diversity jurisdiction under 28 U.S.C. § 1332 is proper only when complete diversity exists between the parties and "the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs."  The "amount-in-controversy threshold" is a necessary "ingredient of subject-matter jurisdiction."  *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006).  This "monetary floor" must be met before a federal court properly exercises diversity jurisdiction.  *Id.*  A claim for damages made in apparent good faith controls the jurisdictional question, and "the jurisdictional facts must be judged as of the time the complaint is filed."  *St. Paul Reinsurance Co., Ltd. v. Greenberg*, 134 F.3d 1250, 1253 (5th Cir. 1998).

When "it appears or is in some way shown that the amount stated in the complaint is not claimed in 'good faith,'" however, courts may look beyond a plaintiff's allegations.  *Horton v. Liberty Mut. Ins. Co.*, 367 U.S. 348, 353 (1961) (quoting *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288 (1938)).  Dismissal of an alleged diversity action for lack of jurisdiction is proper when it "appear[s] to a legal certainty that the claim is really for less than the jurisdictional amount."  *Id.* (quoting *St. Paul Mercury Indem. Co.*, 303 U.S. at 289).  Claimed damages necessarily

11

fall short of the jurisdictional amount when disregarding any asserted defense, there is a legal cert-ainty "that the plaintiff cannot recover the amount claimed", or "that the plaintiff never was entitled to recover that amount, and that his claim was therefore colorable for the purpose of conferring jurisdiction." *De Aguilar v. Boeing Co.*, 47 F.3d 1404, 1409 (5th Cir. 1995) (quoting *St. Paul Mercury Indem. Co.*, 303 U.S. at 289). When determining the amount in controversy, the courts may apply common sense to the allegations, *Allen v. R & H Oil & Gas Co.*, 63 F.3d 1326, 1336 (5th Cir. 1995), and "may look, not only to the face of the complaint, but to the proofs offered by the parties." *U.S. Fire Ins. Co. v. Villegas*, 242 F.3d 279, 283 (5th Cir. 2001). The amount in controversy includes all damages available under the law governing the suit, but the party seeking to invoke the court's jurisdiction must rely on more than conclusory allegations to establish jurisdiction. *St. Paul Reinsurance Co., Ltd. v. Greenberg*, 134 F.3d 1250, 1254-55 (5th Cir. 1998).

### 1.    *Contractual Limitation on Liability*

Defendant argues that according to the limitation of liability clause outlined in the License Agreement, Plaintiffs cannot recover more than $2,000 as a matter of legal certainty, and therefore cannot satisfy the amount-in-controversy requirement of 28 U.S.C. § 1332. (doc. 10 at 12.) Defendant contends that the limitation of liability clause limits Plaintiffs' damages to the amount they paid to Defendant for the software in the 12-month period preceding the event giving rise their claim, and Plaintiffs paid it only $1,740.30 for the 12-month period prior to February 2011. (*Id.* at 11.) They further argue that contractual limitation of liability clauses are enforceable under California law.[5] (*Id* at 12-13.)

Given Defendant's argument and submission of the License Agreement, Plaintiffs have the

---

[5]The parties agree that California law governs the License Agreement. (*See* doc. 10 at 10; doc. 14 at 7.)

burden of proving by the preponderance of the evidence that the contractual limitation of liability, which limits their damages to under $2,000, is not applicable to their claims. *See Superior MRI Services, Inc.*, 778 F.3d at 504 ("To defeat a factual attack, a plaintiff 'must prove the existence of subject-matter jurisdiction by a preponderance fo the evidence'".). Plaintiffs argue that the limitation of liability clause is not applicable because the License Agreement does not cover their claims.

As outlined above, the contractual limitation of liability provides that the entire cumulative liability of Defendant "for any reason arising from or relating to" the License Agreement is limited to the amount paid by the customer in the 12-month period immediately proceeding the event giving rise to the claim. (doc. 10-1 at 6.) The amount paid by Plaintiffs in the 12-month period preceding the alleged misfilings is $1,740. (doc. 10-1 at 27.) The phrase "for any reason arising from or relating to this Agreement" suggests that the limitation of liability clause is applicable to Plaintiffs' claims because the claims arise from and relate to the License Agreement (as outlined above), which covers Plaintiffs' use of Defendant's payroll services.

The limitation of liability clause is qualified by the phrase, "unless otherwise separately agreed by [Defendant] in writing." (*Id*. at 6-7.) Section B.7.(2) of the License Agreement, which expressly covers Quickbooks Assisted Payroll services, states that additional terms and conditions of Assisted Payroll are provided within the Quickbooks Assisted Payroll Services Agreement. (*Id*. at 8.) Plaintiffs have not provided the Quickbooks Assisted Payroll Services Agreement, or any other writing that conflicts with and controls over the limitation of liability clause. Accordingly, they have failed to meet their burden of proving by a preponderance of evidence that the limitation of liability clause is not controlling as to their claims.

13

### 2.      *Good-Faith Claim to Damages*

Defendant also argues that Plaintiffs cannot make a good-faith claim to damages exceeding $75,000.   (doc. 10 at 13-14.)   It contends that Plaintiffs' tax liability of $124,405.27 has been waived by the IRS, and the only other damages quantified in the complaint are Plaintiffs' expenses relating to the resolving the issue, which Plaintiffs allege is $24,873.75.   (*Id.*)   Accordingly, Defendant claims that even if Plaintiffs could circumvent the contractual limitation on liability, their costs are insufficient to meet the amount in controversy requirement.   (*Id*. at 14.)

Again, Plaintiffs have the burden of proving that their damages are at or above $75,000. Plaintiffs respond that because their counsel wrote a demand letter to Defendant due to a new IRS notice showing Plaintiffs still owed $124,405.27 in payroll taxes, there is not a question that the amount in controversy exceeded $75,000 at the time the complaint was filed. (doc. 14 at 12.)  They further argue that subsequent to the filing of the complaint, they received notice from the SSA that based on Defendant's tax filing, social security wages were underreported and underpaid. (*Id*.) They claim that this social security issue remains open, and they will continue to incur CPA fees, management fees, and attorneys' fees until it is resolved.[6]  (*Id*.)

As noted above, "the jurisdictional facts must be judged as of the time the complaint is filed." *St. Paul Reinsurance Co., Ltd.*, 134 F.3d at 1253.  Plaintiffs did not receive notice of the SSA tax liability until after the complaint was filed and there is no mention of the SSA tax liability in the complaint. Therefore, the SSA issue is not considered in determining whether jurisdiction exists.

JRT's Account Transcript did not show any claimed liability that existed at the time the

---

[6]In their response, Plaintiffs say that to extent necessary, they seek leave to file an amended complaint to add the "SSA tax notice" as part of their claims.  (doc. 14 at 6.)  However, they have failed to properly seek leave to amend pursuant to Northern District of Texas Local Rule 15.1, and their request is therefore not considered.

complaint was filed on May 16, 2014.[7]  (*See* doc. 10-1 at 38-39.)  Based on the Account Transcript for JII that the IRS provided Defendant on June 3, 2014, as of the date Plaintiffs filed their complaint, all of the tax liability except for $1.91, had been abated and removed from JII's account. (*See* doc. 10 -1 at 34-36.)  That amount, together with the $46,000 Plaintiffs allege they have incurred in CPA fees, attorneys' fees, and executive management time in dealing with the erroneous payroll tax filings, does not add up to the $75,000 jurisdictional floor.  Even if Plaintiffs' supplemental evidence regarding the $6,669.85 in overdue taxes for JRT is considered, the amount of the overdue taxes still would not cause Plaintiffs to meet or exceed the jurisdictional amount. Because it appears from the pleadings and record to a legal certainty that Plaintiffs' alleged damages fall short of the jurisdictional floor, they have failed to meet their burden to establish subject-matter jurisdiction.[8]

## III.  RECOMMENDATION

Defendant's 12(b)(1) motion to dismiss for lack of subject-matter jurisdiction should be **GRANTED**, its remaining motions should be **DENIED as moot**, and all of Plaintiffs' claims against Defendant should be dismissed without prejudice for lack of subject-matter jurisdiction.

**SO RECOMMENDED** on this 26th day of May, 2015.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

---

[7]Even assuming the $6,449.37, which Plaintiffs contend that JRT owned to the IRS before the tax liability was alleged resolved (*see* doc. 1 at 3; 14-1 at 2-3), was still a liability as of the date the complaint was filed, it would not meet or exceed the jurisdictional floor even in conjunction with the claimed $46,000 in damages for CPA fees, attorneys' fee, and executive management time.

[8]Because Defendant's motion to dismiss for lack of subject-matter jurisdiction should be granted, the remaining motions should be **DENIED as moot**.

15

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law.  Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.  Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error.  *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

16